# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NICOLE COX,** | |
| Plaintiff, | |
| v. | Case No. 1:16-cv-01966 (TNM) |
| **KRISTJEN NIELSEN**, *Secretary, U.S. Department of Homeland Security*, | |
| Defendant. | |

## MEMORANDUM OPINION

Nicole Cox was hired as a Secret Service police officer, but the Service did not retain her beyond her three-year probationary period. She alleges that the Secret Service's decision was based on her disability, in violation of the Rehabilitation Act of 1973, and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* She also alleges that the Service failed to accommodate her disability in violation of the Rehabilitation Act.[1] The Secretary of Homeland Security, who oversees the Secret Service, moved for summary judgment, and the Magistrate Judge's Report and Recommendation ("Report") recommends granting her motion. The Court will accept the Report over Ms. Cox's objections and grant summary judgment to the Secretary.[2]

Before the Court are Ms. Cox's objections to the Report. Supp. Obj., ECF No. 32.[3] When a party objects to a magistrate judge's Report, the Court reviews *de novo* any part of the

---

[1] The Court accordingly has federal question jurisdiction under 28 U.S.C. § 1331.

[2] Under Rule 25(d) of the Federal Rules of Civil Procedure, the current Secretary of the Department of Homeland Security, Kristjen Nielsen, is substituted for Jeh Johnson.

[3] Ms. Cox objected to the Report on January 31, 2019. Obj. to R&R, ECF No. 30. She supplemented her objections several days later. Supp. Obj. to R&R ("Supp. Obj."), ECF No. 32. Because her supplemental objections incorporate her original objections, the Court refers only to the supplement.

magistrate judge's disposition to which a party properly objects. Fed. R. Civ. P. 72(b)(3). The district court may then "accept, reject, or modify the recommended disposition." *Id.*

Upon consideration of the Report, Ms. Cox's objections, the Secretary's response, the briefing on the motion for summary judgment, and the entire record, the Court will adopt the findings and conclusions of the Report in full. Having reviewed this case *de novo*, the Court agrees with the entirety of the Report and will adopt and incorporate its analysis and conclusions as its own. The Court provides supplemental analysis here in response to Ms. Cox's objections.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Moreover, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). Once the moving party meets its burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

a. The Secret Service had legitimate, nondiscriminatory reasons for not converting Ms. Cox to career status.

Ms. Cox does not object to the Report's finding that the Secret Service had legitimate, nondiscriminatory reasons for not converting her to career status.[4] So even if Ms. Cox could establish a *prima facie* case of discrimination, under the burden-shifting framework applicable to discrimination claims, she must show that the Service's proffered reason is a pretext for discrimination. *See, e.g., Hatter v. Wash. Metro. Area Transit Auth.*, 244 F. Supp. 3d 132, 136 (D.D.C. 2017). That is, Ms. Cox must show that her gender or disability was the actual reason

---

[4] For example, Ms. Cox failed to properly use her BlackBerry and was not candid with her supervisors when approached about the issue. *See* R&R at 6–7.

2

for her non-conversion. *See Brady v. Office of Serg. at Arms*, 520 F.3d 490, 493–95 (D.C. Cir. 2008) (Title VII); *Butler v. Wash. Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 81 (D.D.C. 2017) (Rehabilitation Act). But she does not dispute the Report's findings regarding job performance issues that supported the Secret Service's decision, *see* R&R at 25. She has not shown that her disability or gender, rather than her performance issues, motivated the Secret Service's decision.[5]

b. Ms. Cox was not a "qualified individual" under the Rehabilitation Act.

Ms. Cox's discrimination and failure-to-accommodate claims under the Rehabilitation Act both fail. To establish a discrimination claim under the Rehabilitation Act, Ms. Cox must show that she was a "qualified individual with a disability." *See Badwal v. Bd. of Trustees of the Univ. of D.C.*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015). So too for failure-to-accommodate claims. *See id.* at 312. But Ms. Cox is not a "qualified individual," because she could not perform the essential functions of her job when the Secret Service decided not to convert her to career status.[6] *See* Dr. Miller Assessment at 1, ECF No. 26-19 (Ms. Cox's status: "Not medically qualified to perform the essential functions of the job").

Ms. Cox objects that the Report relies on the wrong adverse employment action date to assess whether she was qualified at the time of her non-conversion. Not so. The Report evaluated whether Ms. Cox was a qualified individual as of October 12, 2011, the date she received notice that she would not be converted to a career employee. *See* R&R at 17–20. And a "notice of termination itself constitutes an adverse employment action, even when the

---

[5] Her objections to the Report's findings about her comparator evidence are discussed below.
[6] "The Rehabilitation Act . . . is to be interpreted coterminously with the [Americans with Disabilities Act ("ADA")], *Dave v. Lanier*, 681 F. Supp. 2d 68, 73 n. 4 (D.D.C. 2010), and under the ADA a "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

employer later rescinds the termination." *See Shultz v. Congreg'n Shearith Israel of N.Y.C.*, 867
F.3d 298, 305–06 (2d Cir. 2017) (citing *Green v. Brennan*, 136 S. Ct. 1769 (2016); *Chardon v.
Fernandez*, 454 U.S. 6 (1981); and *Del. State College v. Ricks*, 449 U.S. 250 (1980)).

In any event, using Ms. Cox's proposed date—November 12, 2011—gets her out of the
frying pan but into the fire. First, Ms. Cox appears to misplace the burden. *See* Sub. Obj. at 3–8
(arguing that medical evidence did not prove Ms. Cox "could not be a 'qualified individual' in
November 2011"). *The plaintiff* must show a genuine dispute whether she was a qualified
individual at the time of the adverse employment action. *See Butler*, 275 F. Supp. 3d at 75. But
she has pointed to no evidence from around November 2011 suggesting that she could perform
the essential functions of her job. And her failure to direct the Court to this evidence dooms her
claim, because she has the burden to establish a *prima facie* case under the Rehabilitation Act.
*See Brown v. PSI Servs., Inc.*, 736 F. Supp. 2d 234, 236 (D.D.C. 2010) ("a moving party may
succeed on summary judgment by pointing to the absence of evidence proffered by the non-
moving party").

Indeed, the evidence suggests that before, on, and after November 12, 2011, Ms. Cox
could not perform the essential functions of her job. In the months before November 2011, two
doctors determined that Ms. Cox was unable to wear a gun belt. *See* Dr. Pfeifer Assessment at 2,
ECF No. 26-18; Dr. Small Assessment at 2, ECF No. 26-17. Based on those opinions and other
medical evidence, Dr. Miller found that Ms. Cox was not qualified to perform the essential
functions of her job as of October 12, 2011. *See* Dr. Miller Assessment at 1–2.[7]

While Dr. Pfeifer and Dr. Small "anticipated" that Ms. Cox would recover, speculative
predictions about how Ms. Cox would progress do not create a genuine issue of fact whether

---

[7] Contrary to Ms. Cox's suggestion, Supp. Obj. at 2, nothing in Dr. Miller's assessment suggests that he was in the
process of lifting Ms. Cox's medical restrictions. *See* Dr. Miller Assessment, ECF No. 26-19.

months later Ms. Cox had, in fact, recovered. *Cf., Mazza v. Bratton*, 108 F. Supp. 2d 167, 175 (E.D.N.Y. 2000) (finding that a doctor's note stating that "plaintiff would be able to return to his duties with accommodations if he responded well to intensive medical therapy" did not establish a question of fact whether the plaintiff was a qualified individual). Ms. Cox can point to no medical evidence from around November 2011 that shows she had in fact recovered.

More, in October 2011, Ms. Cox suffered a seizure, after which, by her own admission, she could not drive or carry a gun for six months, Cox Dep. at 12 ("once you have a seizure, you're no longer allowed to carry a weapon").[8] *See* Ex. V, 22-3. The doctors' predictions that Ms. Cox would fully recover were made before this incident and so did not account for it. Indeed, Dr. Small based her August 2011 prediction that Ms. Cox would fully recover within six months on the assumption that Ms. Cox "does not have additional medial impairments." Dr. Small Assessment at 2.[9] And well in to 2012, Ms. Cox sought treatment for pain. *See* Dr. Marvel Assessments (March and December 2012), Ex. 3, ECF No. 22-2. All of this suggests that in November 2011 Ms. Cox was not a "qualified individual," and she has pointed to no evidence that would create a genuine dispute of fact that she was.

    c.   <u>It is not clear that Ms. Cox requested a reasonable accommodation and, if she did, she was accommodated.</u>

Ms. Cox's failure to accommodate claim also fails because she has not showed that she requested an accommodation. To carry her burden, Ms. Cox "must supply enough information that, under the circumstances, the employer can be fairly said to know of both the disability and

---

[8] Ms. Cox objects that her "position description does not identify driving a vehicle as an essential function of the position." Supp. Obj. at 6 (citing Job Description, Ex. Q, ECF No. 22-3). But regardless whether driving is an essential function for law enforcement officers, it its beyond dispute that use of a firearm is. Indeed, Ms. Cox concedes that the position description requires "skill in the usage of firearms above the degree necessary for qualification." *Id.*

[9] Dr. Miller's evaluation issued on the same day Ms. Cox suffered her seizure, so it likely does not account for Ms. Cox's condition after the seizure either.

the desire for accommodation." *Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006) (cleaned up). But she has not done so.

Ms. Cox argues that she pointed to several doctors' notes that stated that while she could not perform the essential functions of her job, recovery was expected in the future. *See* Supp. Obj. at 9–10. She argues that these notes were evidence that she requested an accommodation. *Id.* But it is unlikely that the Secret Service could have known from these notes that Ms. Cox desired an accommodation. *See Thompson*, 433 F. Supp. 2d at 176–77 (even requests for "support in following my doctor's instructions" do not necessarily qualify as a request for accommodations).

Moreover, even if the Court were to interpret the doctors' notes as requests for accommodation, the Service did accommodate Ms. Cox by allowing her to remain on light duty until her term of employment expired. The Secretary maintains that Ms. Cox remained on light duty after her 2010 surgery until her probationary period expired in November 2011. *See* Statement of Material Fact ¶¶ 4, 12, 14, ECF No. 22-1. She has pointed to no evidence showing otherwise. Based on Ms. Cox's performance issues the Secret Service decided not to convert her to career status, and once Ms. Cox's probationary term expired, the Service did not have to accommodate a non-employee.

Ms. Cox also points to Dr. Miller's note to argue that the Secret Service should have offered to reassign her as an accommodation. Supp. Obj. at 16. Her argument on this point is far from pellucid. Anyway, "it is the plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions." *Senatore v. Lynch*, 225 F. Supp. 3d 24, 38 (D.D.C. 2016) (cleaned up). She has not met that obligation. As the Report notes, Ms. Cox may not "skate over this failure of evidence" by claiming that the Secret Service should have

engaged her in an interactive dialogue about accommodations. *See* R&R at 20. In any event, the Secretary has reasonably explained that Ms. Cox was not eligible for reassignment outside the excepted service. *See* Def. Mot. Summ. J. at 3–5, ECF No. 22. And Ms. Cox has admitted that she did not seek qualification for a "Schedule A" Excepted Appointment. *See* ECF No. 22-2 at 48 (Cox Interrogatories).

d. Ms. Cox's objections to the Report's findings about her comparator evidence are unavailing.

First, Ms. Cox objects to the Report's recitation of the standards for evaluating comparator evidence, arguing that under *Johnson v. U.S. Capital Police Board*, 2005 WL 1566392 (D.D.C. July 5, 2005), "whether employees are similarly situated ordinar[ily] presents a question of fact for the jury." Supp. Obj. at 15. But judges may also consider whether employees are similarly situated. *See, e.g., Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008). And Ms. Cox has not alleged enough facts to allow for the kind of meaningful comparison that would enable a factfinder to conclude that she and her comparators were similarly situated.

Ms. Cox also argues that she presented evidence of similarly-situated coworkers that she identified from the Secretary's response to interrogatories. *See* Supp. Obj. at 15 (citing Interrogatories at 4, ECF No. 26-8). It is true that in response to Ms. Cox's request for "similarly situated employees . . . who were not converted to career status in the last 5 years" the Secretary identified three males who were not converted for various reasons. Interrogatories at 4. But that response does not establish that those individuals are valid comparators for Ms. Cox's discrimination claims, nor is it an admission to that effect. And other than the fact that these individuals were not converted to career status, Ms. Cox has identified no similarities between her situation and theirs, *e.g.*, that they had the same supervisor. In any event, Ms. Cox has not

shown that these employees were treated more favorably than her; they too were terminated. *See Dobbs v. Roche*, 329 F. Supp. 2d 33, 43–44 (D.D.C. 2004) (finding that a plaintiff cannot show discrimination by pointing to similarly situated employees who are "treated identically to the plaintiff").

    e. <u>The Secret Service's reason for not converting Ms. Cox to career status was not a pretext for sex discrimination.</u>

Ms. Cox's objection to the Report's Title VII findings is unclear. She argues that she "offered evidence identifying similarly situated male coworkers who had engaged in similar conduct who were not similarly disciplined." Supp. Obj. at 16. Presumably, she is referring to the male Uniform Division officer who received a one-day suspension for misplacing his weapon and the "discipline" she claims is her non-conversion. But, as the Report explains, there is insufficient evidence that the circumstances of the comparators' employment were like Ms. Cox's or that his misconduct was "categorically similar," *see Evans v. District of Columbia*, 219 F. Supp. 3d 99, 109–10 (D.D.C. 2016). For example, he misplaced his government property for only 45 minutes, while Ms. Cox went days without knowing where her BlackBerry was. *See* Cox Dep. at 10. And there is no evidence that the other officer lacked candor when confronted about his missing government property. There is no apples-to-apples comparison here.

*\*\*\**

After considering all of Ms. Cox's objections, none has merit. Thus, the Court will adopt in full the findings in the Report and Recommendation and grant the Defendant's [25] Motion for Summary Judgment as recommended. A separate order will issue.

2019.03.26
17:42:04 -04'00'

Dated: March 26, 2019

TREVOR N. McFADDEN, U.S.D.J.

| | ) | |
|---|---|---|
| **NICOLE COX** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-cv-1966 (TNM/GMH)** |
| | ) | |
| **KRISTJEN NIELSEN,[1] Secretary, U.S.** | ) | |
| **Department of Homeland Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Nicole Cox, a former member of the United States Secret Service (the "Secret Service"), which is a component of the Department of Homeland Security ("DHS"), filed this action alleging that she was terminated from her position on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and on the basis of her disability, in violation of section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq.* Defendant, the Secretary of DHS, has filed a motion for summary judgment on both of Plaintiff's claims, which is now ripe for adjudication.[2] For the reasons that follow, the under-signed recommends granting Defendant's motion.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Secretary of the Department of Homeland Security, Kristjen Nielsen, is substituted for Jeh Johnson.

[2] The following docket entries are relevant to the resolution of this motion: (1) the Complaint (ECF No. 1); (2) Defendant's motion for summary judgment and exhibits (ECF No. 22 through 22-3), including her statement of material facts about which there is no genuine dispute (ECF No. 22-1); (2) Plaintiff's opposition to Defendant's motion for summary judgment and exhibits (ECF No. 25; ECF No. 26 through 26-35), including her statement of material facts about which there is a genuine dispute (ECF No. 26-1); and Defendant's reply in further support of her motion for summary judgment (ECF No. 27).

# I.    BACKGROUND[3]

In this case, approximately two years after Plaintiff was hired as a probationary employee of the Uniformed Division of the Secret Service, she experienced a medical issue and was reassigned to light duty. At the crux of this action is Defendant's failure to convert Plaintiff to a career employee of that agency at the end of her three-year probationary period. Plaintiff argues that Defendant's conduct constitutes an illegal failure to accommodate her disability and that the asserted reasons for the failure to convert—which include performance issues such as an inability to execute her light duty job functions without supervision, inappropriate emotional responses at work, failure to maintain connectivity on her BlackBerry, and a lack of candor to superiors when she temporarily lost that device—are pretexts for intentional discrimination based on disability and gender.

---

[3] Local Civil Rule 7.1(h) requires a motion for summary judgment to include a "statement of material facts as to which the moving part contends there is no genuine issue" and an opposition to a motion for summary judgment to include "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Here, Plaintiff's submission, although titled "Plaintiff's Statement of Material Facts in Dispute" includes certain facts that are merely rewordings of facts set out in Defendant's statement of material facts not in dispute. For example, Defendant asserts that "Plaintiff was hired as a Uniformed Division (UD) Officer, LE-1, by the United States Secret Service on July 17, 2008." ECF No. 22-1, ¶ 1. Plaintiff's statement of material facts in dispute states, "On July 17, 2008, Plaintiff was hired as a Uniformed Division Officer, LE 1, for the United States Secret Service." ECF No. 26-1, ¶ 1. It would appear, then, that such fact is *not* disputed. Moreover, Plaintiff's statement of material facts in dispute is less than helpful because it does not specifically identify which of Defendant's facts are in dispute; rather, it lists a number of facts that may or may not undermine one or more of Defendant's facts with no cross-reference to the item from Defendant's statement being challenged. Indeed, Plaintiff's statement of material facts in dispute reads less like a submission opposing Defendant's statement of material facts and more like a submission supporting a motion for summary judgment on Plaintiff's behalf. But no such motion has been filed. In any case, the facts related here are undisputed except as noted, such as when the proponent of evidence is specifically identified as having testified to a particular alleged fact.

Plaintiff was hired as a Uniformed Division Officer, LE 1,[4] in the Secret Service on July 17, 2008. ECF No. 26-24. The position was a "Schedule B" term-limited excepted service[5] position that terminated on November 11, 2011, unless it was "converted to career status after . . . three years of full-time continuous service." *Id.*; ECF No. 26-20 at 1. The purpose of the three-year "trial period" was to allow the supervisor to observe the employee's conduct and performance, provide guidance, and evaluate her potential to "determine whether the employee is suited for successful performance in the position." ECF No. 26-27 at 1. According to the position description, a Uniformed Division Officer's duties include, among other things, standing fixed posts or patrolling on foot or by vehicle; physically responding to security alarms and taking appropriate response action, such as using appropriate physical force to apprehend individuals involved; and taking "decisive and immediate action in emergency situations," such as using "sufficient force to quell disturbances and arrest individuals." ECF No. 22-3 at 53. Among the required "[t]echnical [c]ompetencies" for the position are "[s]kill in the use of firearms above the degree necessary for qualification," the "[a]bility to remain calm in a crisis and exercise independent judgment during emergencies," and the "[a]bility to communicate with high-level government officials as well as with the general public in a variety of situations." *Id.* at 54. Plaintiff successfully completed her Uniformed Division training course on February 10, 2009, and was commissioned as a Secret Service Uniformed Division police officer. ECF No. 26-29 at 1. Plaintiff was first assigned to the White House complex. ECF No. 22-3 at 16. During the period Plaintiff was on full duty, her

---

[4] This code appears to identify the pay plan and grade/level at which Plaintiff was appointed. ECF No. 26-24 at 1. Neither party explains its significance.

[5] The "excepted service" is statutorily defined as "those civil service positions which are not in the competitive service or the Senior Executive Service." 5 U.S.C. § 2103(a).

performance reviews did not reflect a rating lower than acceptable. ECF Nos. 26-28 through 26-32.

On May 13, 2010, Plaintiff began suffering pain in her lower pelvic region; she was later diagnosed with endometriosis.[6] ECF No. 26-16 at 3. She had surgery on May 18, 2010, and was placed on medical leave for three weeks, with restrictions on running, prolonged standing or walking, jumping, climbing stairs, using firearms, wrestling, grappling, twisting, and lifting, among other activities. *Id.*; ECF No. 26-26. At the end of that period, on June 9, 2010, she reported to the Secret Service that she was still recovering. ECF No. 22-3 at 16. She was therefore placed on "limited duty status" with the Safety and Health Unit, where she performed administrative duties, including data entry and filing. ECF No. 22-3 at 16, 94; ECF No. 26-3 at 4. On Plaintiff's mid-year performance review, issued on February 22, 2011, Sgt. Matthew Isaacson indicated that she was "meeting all elements in an acceptable manner" and noted that two special agents who supervised her in the Safety and Health Unit—Special Agent in Charge Armiger and Assistant to the Special Agent in Charge Hourican—had commended her work product and work ethic. ECF No. 26-34 at 4. On May 8, 2011, she received a cash award for her job performance. ECF No. 26-11. In her final appraisal for the period ending June 30, 2011, which was submitted on July 13, 2011, and approved on July 14, 2011, she received no rating lower than "acceptable," and received an "exceeded expectations" rating in technical proficiency. ECF No. 26-35. The appraisal again noted that two of her supervisors had commended her performance. *Id.* at 4.

---

[6] Endometriosis is a disorder in which the tissue that lines the uterus grows outside of that organ but continues to act as it normally would, thickening, breaking down, and bleeding with each menstrual cycle. The condition is often painful, especially during menstrual periods. Endometriosis, https://www.mayoclinic.org/diseases-conditions/endometriosis/symptoms-causes/syc-20354656 (last visited Dec. 28, 2018).

In July 2011, supervisors began noting performance issues. ECF No. 26-8 at 5. On July 20, 2011, Plaintiff had a meeting with Special Agents Armiger and Hourican. ECF No. 26-3 at 4–5.[7] At the meeting, the special agents expressed concerns about productivity and informed Plaintiff that the student intern who worked with her required more structure in order to complete his duties. *Id.* at 5. Therefore, they required him to be in the file room four hours per day and to count each piece of paper he filed. *Id.* To show that the intern and Plaintiff were "working as a team," Special Agents Armiger and Hourican requested that Plaintiff also be in the filing room four hours per day and similarly keep track of the filing she completed. *Id.* This would allow them to determine how much filing was getting done and by whom. ECF No. 26-8 at 4. They also asked Plaintiff to open the medical filing room, although, according to Sgt. Cook, her immediate supervisor, that was not part of her job duties as a limited duty officer temporarily assigned to the Safety and Health Unit. ECF No. 26-3 at 5. After the meeting, Plaintiff was upset and crying because she felt that she was being punished for the intern's failure to complete his duties and that her medical restrictions prevented her from filing for four hours per day. *Id.* at 6. At some point that day, Sgt. Cook asked Plaintiff if she wanted to remain in the Safety and Health Unit. *Id.* Plaintiff sought a transfer. *Id.*

Sgt. Cook testified that this was one of a number of times that she saw Plaintiff respond in an "extremely emotional" manner to work situations. ECF No. 26-4 at 8–10. Sgt. Cook also testified that she began to have concerns about Plaintiff's job performance, specifically with her emotional and behavioral responses. *Id.* at 5–6. Deputy Chief Thomas Sullivan, who was near

---

[7] Plaintiff's deposition does not identify the date of the meeting. However, she asserts later that the meeting was interrupted when Sgt. Isaacson asked her to sign off on her evaluation. ECF No. 26-3 at 6. That occurred on July 20, 2011. ECF No. 26-35 at 4.

the top of Plaintiff's chain of command, similarly testified that he witnessed her emotional responses and also noted a drop in her performance rate in the Safety and Health Unit. ECF No. 26-6 at 16–17.

Effective July 25, 2011, Plaintiff was transferred to the Security Clearance Division. ECF No. 22-2 at 2. She was transferred out of that office at the request of her supervisor after one day because she was able to complete data entry on only two of six assigned files, and the data she entered needed to be corrected. ECF No. 26-25 at 2. She was then assigned to the Central Files Office, where her duties consisted of shredding files. *Id.*; ECF No. 26-3 at 8.

Meanwhile, Plaintiff had trouble with her BlackBerry. A uniformed officer must maintain connectivity of her BlackBerry at all times. ECF No. 26-7 at 10. On five occasions between November 2010 and June 2011, a technician contacted Sgt. Cook to alert her that Plaintiff's device had been incommunicado for periods of days. ECF No. 22-3 at 102–06. On July 30, 3011, Plaintiff misplaced her BlackBerry. ECF No. 26-3 at 10. At a meeting on August 1 or 2, 2011, with Sgt. Cook and Inspector Marty Wilkerson, Plaintiff was reminded to maintain the connectivity of her BlackBerry and asked if her device was functioning properly, to which she replied that the BlackBerry was functioning properly and she was having no connectivity issues. ECF No. 26-3 at 10; ECF No. 26-15 at 2; ECF No. 26-25 at 2. Specifically, Plaintiff testified at her deposition as follows:

> Q. [I]n the August 2nd meeting, what did Inspector Wilkerson ask you about your BlackBerry?
>
> A. He asked me if my BlackBerry was functioning properly and if I had any connectivity issues.
>
> Q. Okay. And how did you respond?
>
> A. I responded that my BlackBerry was functioning properly and I didn't believe I was having any connectivity issues.

Q.      Okay. And at that time, when had you last seen your BlackBerry?

A.      Saturday, July 30th.

Q.      Okay. So how did you know it was functioning?

A.      Well, the last time I saw it, it was functioning properly.

ECF No. 26-3 at 10. Approximately two hours later, Plaintiff told Sgt. Cook that the BlackBerry was no longer in her possession, as she had not seen it for three days.[8] ECF No. 26-3 at 10–11; ECF No. 26-12 at 2; ECF No. 26-15 at 2; ECF No. 26-25 at 2. Plaintiff eventually found the device on August 4, 2011. ECF No. 26-3 at 11; ECF No. 26-12 at 5.

On August 26, 2011, Capt. Norine Wojtanowski authored a memorandum to the Chief of the Uniformed Division regarding whether Plaintiff should be converted to career status. ECF No. 26-25. The memorandum reported that Plaintiff had often sought assistance from Sgt. Cook when she was assigned to the Safety and Health Unit and she often became emotional during supervisory meetings, including during the meeting with Special Agents Armiger and Hourican in July 2011. *Id.* at 1–2. Capt. Wojtanowski did not recommend Plaintiff for conversion to career status, noting that (1) "[h]er lack of honesty during her meeting with Inspector Wilkerson [regarding her Black-Berry] and her failure to maintain accountability for her equipment at all times [was] problematic"; (2) she "lack[ed] the ability to function independently without close supervision and require[d] frequent direction when performing her job functions," and (3) her "inappropriate emotional re-sponses [were] troubling." *Id.* at 2. Capt. Wojtanowski concluded that Plaintiff did "not fit the

---

[8] Plaintiff's assertion that "[a]s soon as Plaintiff became aware that she did not have possession of her Blackberry she reported it missing" (ECF No. 10 at 7) has no support in the record. Rather, Plaintiff admitted at her deposition that when she said that the device was functioning correctly she was "unsure of where its location was, to be honest." ECF No. 26-3 at 10.

culture of the United States Secret Service" and that she had "proven through her work performance that she [was] incapable of meeting the performance standards of an officer with the Secret Service Uniformed Division." *Id.*

In a statement of medical clearance submitted to Defendant in August 2011, Plaintiff's physical therapist, Dr. Jennifer Small, reported that Plaintiff was not able to wear a gun belt due to her use of prescription narcotic pain medication. ECF No. 26-17. Dr. Smalls anticipated Plaintiff's full recovery within six months, that is, by mid-February 2012. *Id.* On September 23, 2011, Plaintiff's physician Dr. Samantha Pfeifer reported to Dr. Richard Miller, the Secret Service reviewing medical officer, that Plaintiff was then able to wear a gun belt with all current Secret Service standard-issue equipment, and that she anticipated that Plaintiff would "achieve full recovery within the next 4 weeks," that is, by October 21, 2011. ECF No. 26-18.

On October 12, 2011, Dr. Miller completed a medical review form. ECF No. 26-19. In addition to the reports of Dr. Small and Dr. Pfeifer, Dr. Miller reviewed a report from Dr. Edith Bautista-Quint, Plaintiff's pain specialist, who reported that as of August 22, 2011, Plaintiff reported upper back pain and abdominal pain; a checklist from Dr. Pfeifer from August 26, 2011, noting that Plaintiff had restrictions for "control tactics, firearms, reaching/lifting overhead, [and] lifting > 10#"; and a September 6, 2011 report from nurse practitioner Jennifer Fariello stating that Plaintiff had made progress but should not lift more than ten pounds and that Plaintiff could "have long periods of remission, however flares can and do occur." *Id.* at 2. Based on that information, Dr. Miller found that Plaintiff was not medically qualified to perform the essential functions of her job, noting restrictions on control tactics training and firearms training; lifting, carrying, pushing, and pulling more than ten pounds; climbing stairs; jumping; crawling, kneeling, or squatting; and

work assignments with the potential of physical confrontation or that involve walking or standing. *Id.* at 3.

Also on October 12, 2011, the Secret Service informed Plaintiff that she would not be converted to career status, and her appointment would end on November 12, 2011. ECF No. 26-21. At some point that same day, Plaintiff had a seizure. ECF No. 22-3 at 67–68. Plaintiff testified at her deposition that because of the seizure, she could not drive a vehicle or carry a weapon for six months. ECF No. 26-3 at 12.

After she was not converted to career status, Plaintiff did not seek to be cleared for duty by Dr. Pfeifer. ECF No. 22-2 at 10. Plaintiff continued to seek treatment for chronic pelvic pain, visiting a physician on March 1, 2012, complaining of pelvic pain and lower back pain, which was exacerbated by prolonged standing, among other things. *Id.* at 17. In a report dated December 17, 2012, her physician reported that she had continued to complain of pelvic pain—indeed, the pain had increased—and that she "want[ed] to be able to work full time." *Id.* at 31–32.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In order to establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting

*Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine dispute for trial." *Id.*  Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014).  Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence. *Id.*  Accordingly, an employment discrimination or retaliation plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.*

### B. Rehabilitation Act and Title VII

#### 1. Disparate Impact

The Rehabilitation Act protects federal employees against discrimination based on disability. *See, e.g.*, *Welsh v. Hagler*, 83 F. Supp. 3d 212, 222 (D.D.C. 2015) ("[T]he Rehabilitation Act is the exclusive remedy for federal employees alleging disability discrimination.").  "Due to the substantial similarity between the Rehabilitation Act and the Americans with Disabilities Act ('ADA'), cases interpreting the ADA are equally applicable when analyzing a claim under the Rehabilitation Act." *Badwal v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015) (internal citation omitted) (citing 42 U.S.C. § 12101 *et seq.*).  "[T]he Rehabilitation Act provides that 'no otherwise qualified individual with a disability' may 'be subjected to discrimination' by programs receiving federal funding 'solely by reason of her or his disability.'" *Butler v. Washington Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 80 (D.D.C. 2017 (quoting 29 U.S.C. § 794(a)).  Thus, to establish a claim of intentional discrimination under the Rehabilitation Act, a plaintiff must show that she (1) had a disability within the meaning of the

statute, (2) was qualified for the position with or without a reasonable accommodation, and (3) suffered an adverse employment action because of her disability. *Id.* at 80–81. A person is qualified for a position if she can "perform the essential functions of the employment position," 42 U.S.C. § 12111(8), defined as "the fundamental job duties of the employment position the individual with a disability holds or desires," 29 C.F.R. § 1630.2(n)(1). Finally, "the causation element of intentional discrimination . . . claims brought under [the Rehabilitation] Act cannot be satisfied by a motivating factor test; rather, the applicable analysis is the traditional 'but-for' causation standard." *Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015).

Under Title VII, it is unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e–2, 2000e–3. The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly-situated employees outside the protected class. *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934 F. Supp. 2d 220, 230 (D.D.C. 2013).

Where, as here, a plaintiff does not offer direct evidence of discrimination, courts generally analyze disparate impact claims under Title VII and the Rehabilitation Act "using the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Diggs v. Potter*, 700 F. Supp. 2d 20, 40 (D.D.C. 2010); *see also Jones v. Univ. of the Dist. of Columbia*, 505 F. Supp. 2d 78, 87 (D.D.C. 2007) ("In cases where the employer denies that its actions were motivated by the plaintiff's disability, the court applies the *McDonnell Douglas* burden-shifting framework to a disability-discrimination claim under the Rehabilitation Act."). Under

that framework, the plaintiff must initially establish a prima facie case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. Once the plaintiff succeeds in making her prima facie showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the challenged action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In employment discrimination cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory reasons for its actions. Where an employer has done so, "judicial inquiry into the prima facie case is usually misplaced." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see also Porter v. Sebelius*, 192 F. Supp. 3d 8, 16 (D.D.C. 2016) ("[T]he *Brady* modification to the *McDonnell Douglas* burden shifting framework applies in Rehabilitation Act cases . . . if a defendant answers a plaintiff's claims by providing a nondiscriminatory reason for its actions."). However, a plaintiff must still establish certain "threshold" issues, even if they are part of the prima facie case, in order to survive a motion for summary judgment. *See, e.g., Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 258 (D.D.C. 2017) ("As the *Brady* court noted, the question of whether the plaintiff has established a prima facie case 'is *almost* always irrelevant'; *i.e.*, it is not always irrelevant." (internal citation omitted) (quoting *Brady*, 520 F.3d at 493)); *see also, e.g., Dreiband v. Nielson*, 319 F. Supp. 3d 314, 321 (D.D.C. 2018) (noting in ruling on a motion for summary judgment that the question of whether a plaintiff suffered an adverse employment action is a "threshold question"); *Butler*, 275 F. Supp. 3d at 83 (holding that a plaintiff's failure to show that he could perform an essential function of

13

his position "rendered him not 'otherwise qualified,' and therefore beyond the protection of the Rehabilitation Act").

Once the plaintiff makes such a threshold showing, the "central question" on summary judgment is whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of a protected class or activity. *Brady*, 520 F.3d at 494. The Court of Appeals has clarified that in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1989) (*en banc*)).

To rebut an employer's stated reasons for its actions, a plaintiff may, among other things, come forward with comparative evidence that persons who are similarly situated to the plaintiff but are outside of her protected class have been treated more favorably by the employer. *Brady*, 520 F.3d at 495. A plaintiff is similarly situated to another individual if "all of the relevant aspects of her employment situation [are] 'nearly identical' to those of the [comparator]." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). "If a reasonable juror would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated." *Wilson v. Washington Metro. Area Transit Auth.*, 631 F. Supp. 2d 58. 67 (D.D.C. 2009); *see also Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37

(D.D.C. 1996) ("It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects* . . . ." (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))). To demonstrate that her employment situation is nearly identical to a comparator's, "the alleged comparator 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Toomer v. Carter*, No. 11-cv-2216, 2016 WL 9344023, at *28 (D.D.C. Mar. 24, 2016) (quoting *Phillips*, 937 F. Supp. at 37), *report and recommendation adopted* 266 F. Supp. 3d 184 (D.D.C. 2017); *see also Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 97–98 (D.D.C. 2005).

A plaintiff may also carry her rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts that formed the predicate for the employment decision," *Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "if the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495.

2. Failure to Accommodate

The Rehabilitation Act also supports claims for failure to accommodate a plaintiff's disability. *See, e.g.*, *Badwal*, 139 F. Supp. 3d at 308. To prevail on a such a claim, the plaintiff must demonstrate that (1) she was a qualified individual with a disability, (2) her employer had notice

of the disability, and (3) her employer denied her request for a reasonable accommodation. *Id.* at 312.

Failure to accommodate claims, however, are not subject to the burden-shifting framework of *McDonnell Douglas*. "When a disabled plaintiff alleges a failure to make a reasonable accommodation . . . she need not explain why her employer has failed to accommodate her. The failure to accommodate is itself discriminatory." *Floyd*, 968 F. Supp. 2d at 315–16. That is, "it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship on the operation of the business' of the employer." *Id.* at 316 (quoting *Aka*, 156 F.3d at 1300). Because "[t]he employer's motivation for refusing the accommodation plays no part in that analysis, . . . reasonable-accommodation claims are 'not subject to analysis under *McDonnell Douglas*.'" *Id.* (quoting *Aka*, 156 F.3d at 1288).

### III.   ANALYSIS

#### A.   Rehabilitation Act Claims

##### 1.   Failure to Accommodate

Defendant first argues that Plaintiff cannot recover under the Rehabilitation Act because she cannot establish that she was qualified for the position for which she was hired—that is, that she could, with or without accommodation, "perform the essential functions of the employment position." 42 U.S.C. § 12111(8). A "threshold requirement" of coverage under the Rehabilitation Act is that a person is a "qualified individual with a disability"—that is, that she can perform the essential functions of her job. *Carter v. Carson*, 241 F. Supp. 3d 191, 196 (D.D.C. 2017); *see also Dorchy v. Washington Area Metro. Area Transit Auth.*, 45 F. Supp. 2d 5, 13 (D.D.C. 1999) (granting summary judgment in favor of the defendant in a Rehabilitation Act case where the plaintiff

"failed to meet his threshold burden that he can perform the essential functions of his job").[9] Defendant points out that, as of October 12, 2011—the day Plaintiff received notice that she would not be converted to career status—Dr. Miller, the Secret Service reviewing medical officer, had found she was not medically qualified to perform those functions. ECF No. 26-19 at 2. Specifically, her "pelvic condition" and the aftereffects of her surgery required that she be restricted to sedentary desk duty with additional constraints, including no work-related travel, no assignments with the potential for physical confrontation or that involved standing or walking, no participation in defensive/control tactics training or firearms recertification or training, and no climbing stairs, jumping, crawling, kneeling, squatting, or lifting, carrying, pushing, or pulling more than ten pounds. *Id.* at 2–3. Moreover, Plaintiff admitted at her deposition that her seizure on October 12,

---

[9] Other courts have described this showing as necessary to establish "standing" under the Rehabilitation Act or the ADA. *See, e.g.*, *Fobar v. City of Dearborn Heights*, 994 F. Supp. 878, 884 (E.D. Mich. 1998) ("[The plaintiff] he does not have standing to sue under the ADA because he does not fit within the Act's definition of a qualified individual with a disability."); *Castellano v. City of New York*, 946 F. Supp. 249, 253 (S.D.N.Y. 1996) ("[P]laintiffs fail to meet the threshold definition of a 'qualified individual with a disability' as required Title I of the ADA and the Rehabilitation Act and thus lack standing to pursue this action under these provisions."), *aff'd*, 142 F.3d 58 (2d Cir. 1998); *Morton v. GTE N. Inc.*, 922 F. Supp. 1169, 1183 (N.D. Tex. 1996) ("Therefore, having failed to raise a fact question as to whether she could or would perform the essential functions of any job at GTE, the Court holds that, as a matter of law, Plaintiff was not a qualified individual with a disability at the time the ADA went into effect or at anytime thereafter. Thus, while it was certainly careless and insensitive to terminate Plaintiff without notice, because Plaintiff does not have standing under the ADA to bring a suit for wrongful termination, the claim will fail."), *aff'd sub nom. Morton v. GTE Serv. Corp.*, 114 F.3d 1182 (5th Cir. 1997); *E.E.O.C. v. CNA Ins. Cos.*, No. 95 C 5835, 1996 WL 26879, at *5 (N.D. Ill. Jan. 23, 1996) ("Because it is undisputed that Valladares-Toledo is a totally disabled individual who can no longer perform any job for which she is qualified, Valladares-Toledo does not meet the definition of 'qualified individual with a disability.' The court, therefore, holds that Valladares-Toledo does not have standing to bring a claim under Title I of the ADA."), *aff'd*, 96 F.3d 1039 (7th Cir. 1996).

These cases appear to refer to what has been known as "prudential standing," a label that the Supreme Court has recently called "misleading." *Bank of Am. Corp. v. City of Miami*, __ U.S. __, __, 137 S. Ct. 1296, 1302 (2017) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)). That is because instead of being an issue of judicial prudence, the relevant question is whether "a plaintiff's complaint fall[s] within the zone of interests protected by the law invoked," which is determined "using traditional tools of statutory interpretation." *Lexmark*, 572 U.S. at 126–27 (quoting *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004)). The text of the Rehabilitation Act indicates that a person who cannot perform the job for which she was hired is not entitled to its protections. The Rehabilitation Act protects any "otherwise qualified individual with a disability" from discrimination based on that disability. 29 U.S.C. § 794(a). A person is "qualified" for a position if she can "perform the essential functions of the employment position." 42 U.S.C. § 12111(8). The cases cited above indicate that a plaintiff who cannot show that she was an "otherwise qualified individual with a disability" is not within the zone of interests that the statute was passed to protect.

2011 precluded her from carrying a firearm or driving a vehicle, which "eliminated [the] possibility of [her] getting into a law enforcement job." ECF No. 26-3 at 12.

Plaintiff counters that she "was expected to return to full-duty . . . prior to the deadline for conversion"—that is, November 11, 2011—pointing to Dr. Pfeifer's September 23, 2011 note that anticipated recovery "in next 4 weeks," or approximately October 21, 2011. ECF No. 25 at 19, 22. She further argues that "[e]ven if [she] could not return to full-duty . . . by October 21, [2011], [her] return to full-duty was in the near future," citing Dr. Small's August 17, 2011 prediction of recovery in six months. ECF No. 26-1 at 5.

Plaintiff's attempts to establish that she could perform the essential functions of her job are unavailing. "[A] plaintiff's capacity to perform the essential functions of her job is examined at the time of" the alleged adverse employment action. *Mack v. Georgetown Univ.*, 2017 WL 4325596, at *13 (D.D.C. Aug. 4, 2017) (emphasis omitted), *report and recommendation adopted* 2017 WL 4325617 (D.D.C. Sept. 27, 2017), *aff'd*, 2018 WL 3156846 (D.C. Cir. May 24, 2018); *see also, e.g.*, *Reagan-Diaz v. Sessions*, 246 F. Supp. 3d 325, 338 (D.D.C. 2017) (collecting cases). Here, that is October 12, 2011, the date that Plaintiff received notice that she would not be converted from a probationary employee to a career employee. There is no evidence in the record that could support a finding that on that date, Plaintiff was medically qualified to perform those functions. To the contrary, Dr. Miller found precisely the opposite on October 12, 2011—a conclusion that Plaintiff does not dispute, at least as of that date. ECF No. 26-19. Dr. Pfeifer's prediction that Plaintiff would be ready to return to full duty by the end of October does not change that fact. Plaintiff admitted in her deposition that Dr. Pfeifer would not be able to lift her medical restrictions; Dr. Miller would need to do that. ECF No. 26-3 at 8. Dr. Pfeifer's prognostication is not sufficient to raise a genuine issue of material fact as to Plaintiff's ability to perform the essential

duties of a uniformed division officer at the time Defendant refused to convert her to career status; indeed, it shows that she could not do so. *Cf., e.g. Mazza v. Bratton*, 108 F. Supp. 2d 167, 175 (E.D.N.Y. 2000), *aff'd*, 9 F. App'x 36 (2d Cir. 2001) ("That plaintiff's condition improved following his termination cannot overcome the undisputed evidence from the earlier time period that plaintiff was not qualified to perform the essential functions of his position.").

Moreover, the evidence before the Court belies both Dr. Pfeifer's optimistic prediction and Dr. Small's less optimistic one. Based on his conversations with Dr. Miller, Inspector Wilkerson was unable to determine when Plaintiff might return to full duty. ECF No. 26-5 at 13–14. Plaintiff admitted that, because of the seizure she suffered on October 12, 2011, she would not be able to carry a gun or drive a vehicle—which no one disputes are requirements for the position for which Plaintiff was hired—for a period of at least six months.[10] ECF No. 26-3 at 12. And further medical records show that throughout 2012 Plaintiff continued to complain of severe pain and indicated that it interfered with her ability to work. ECF No. 22-2 at 17, 31–32. An employer is not required "'to wait indefinitely' for an uncertain cure." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465–66 (4th Cir. 2012) (quoting *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995)); *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 201 (D.D.C. 2008) ("[T]he plaintiff's request for an accommodation that would allow her to 'complete her treatment plan' on an indefinite schedule is not acceptable."); *Mazza*, 108 F. Supp. 2d at 175–76 (the "clear import" of a physician's note stating that the plaintiff "would be able to return to his duties with accommodations if he responded favorably to intensive therapy" was that the plaintiff was at that time unable to work and "it was not yet known if [he] could do so in the future"). The undisputed evidence that Plaintiff was not

---

[10] Plaintiff's bald assertion that her seizure "was a direct result of Defendant's actions" (ECF No. 26-1 at 7), is conclusory and not supported by any evidence in the record. Indeed, the report from her neurology consultation on October 13, 2011, states that the "[e]tiology [of the seizure] is not clear at this time," but hypothesizes that it might have been caused by two of Plaintiff's medications, which had been "associated with seizures" (ECF No. 22-3 at 68).

able to perform the essential functions of the job for which she was hired at the time she was not converted from probationary to career status—or even during the year after that—dooms her failure-to-accommodate claim. *See, e.g.*, *Reagan-Diaz*, 246 F. Supp. 3d at 341 (evidence that the plaintiff received benefits indicating her inability to do her job both before and after the adverse employment action "underscores the fact that, at the time, the plaintiff was not prepared to perform the essential functions of her position").

This claim suffers from are other deficiencies, as well. Plaintiff has presented no evidence that she requested any reasonable accommodation. "While there is no requirement that an employee's request for an accommodation be in writing or invoke the magic words 'reasonable accommodation,' the request must make clear that the employee 'wants assistance with his or her disability' so that he or she may return, or continue, to work." *Badwal*, 139 F. Supp. 3d at 313. Here, Plaintiff does not identify any request for a reasonable accommodation in either her response to Defendant's statement of material facts or in her brief in opposition to Defendant's motion for summary judgment. Rather, she attempts to skate over this failure of evidence by asserting that, as a legal matter, "Plaintiff was not required to identify specific reasonable accommodations in her request" and that "[a]fter an employee requests an accommodation, the employer should engage the individual in an interactive process to determine what reasonable accommodation will best suit the disability." ECF No. 25 at 31. Without a request, however, neither of these legal principles comes into play. *See, e.g.*, *Badwal*, 139 F. Supp. 3d at 313 (stating, "While plaintiff is correct in that an employer has an obligation to engage in an interactive process to determine a reasonable accommodation, such an obligation is only triggered where the employee has actually *requested* a reasonable accommodation," and collecting cases (footnote omitted)). That is, "an employee must supply 'enough information that, under the circumstances, the employer can fairly be said to know

of both the disability *and desire for an accommodation.*" *Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)). Thus, courts have found that such inchoate requests as an employee's demand for "support in following [her] doctor's instructions" is insufficient to constitute a request for accommodation. *Id.* at 176–77. Here, Plaintiff has failed to identify even a plea as vague as that.[11] Indeed, the record indicates that, once Plaintiff received notice that she was not being converted, she ultimately resigned herself to the fact that her tenure at the Secret Service would end. As she testified at her deposition, she never asked anyone in the Uniformed Division whether a non-law enforcement position would be available to her. ECF No. 26-3 at 12. Moreover, she did not return to her physician Dr. Pfeifer for follow-up in October 2011 because she had not been converted and "there was nothing to go back to" at the Secret Service. *Id.* at 12–13.

Any contention that Defendant was required to keep her on light duty as an accommodation fails. The closest Plaintiff comes to making such an argument is two sentences in her opposition to Defendant's motion: "There is no time limit for reasonable accommodations that an agency must provide. Plaintiff had been working in a light-duty position for approximately fourteen months at the time of her employment termination with no documented performance issues." ECF No. 25 at 23. Beyond including the demonstrably false statement that Plaintiff's performance issues were not

---

[11] The D.C. Circuit has suggested that "[t]here may well be cases where the plaintiff's need for accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *Chenari v. George Washington Univ.*, 847 F.3d 740, 748 (D.C. Cir. 2015) (citing *Pierce v. District of Columbia*, 126 F. Supp. 3d 250 (D.D.C. 2006). In *Pierce*, a deaf prison inmate with significant communication problems sued under the ADA alleging he was "denied an effective means of receiving or imparting information at various critical points during his period of incarceration." 128 F. Supp. 3d at 253–54. The district court held that, under the circumstances of that case, the plaintiff was not required to have made a request for an accommodation, pointing specifically to the facts that (1) he was in a prison facility, where officials "have complete control over whether prison inmates (whether disabled or not) receive any programs or services," and (2) he had "known communications-related difficulties." *Id.* at 269–270. Plaintiff's circumstances are far removed from those at issue in *Pierce*. *Cf. Waggel v. George Washington Univ.*, Civil Action No. 16-1412 (CKK), 2018 WL 5886653, at *6 (D.D.C. Nov. 9, 2018) (rejecting notion that the plaintiff was absolved from requesting a reasonable accommodation as in *Pierce* where there was no evidence that she "lacked the capacity to make [such] a request"), *appeal docketed*, No. 18-7181 (D.C. Cir. Nov. 30, 2018).

documented—they are clearly outlined in Capt. Wojtanowski's memo of August 26, 2011—Plaintiff makes no reference to the record evidence and no citation to authority in support of this contention. The argument should therefore be deemed forfeit because it is undeveloped. *See, e.g.*, *United States v. TDC Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (holding argument "forfeit because [the party] does not further develop it (or even mention it again) after [a] 'single, conclusory statement'" (quoting *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008))); *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

Such an argument would fail on its merits, as well. This Court's decision in *Jones v. University of the Dist. of Columbia*, 505 F. Supp. 2d 78 (D.D.C. 2007), is instructive. There, the plaintiff was hired as a police officer by the university. *Id.* at 82. After suffering two job-related injuries, one of which required her to take pain medication that prohibited her from carrying a gun, she was placed on light-duty status for a period of three years. *Id.* After a third incident, her request for continued light duty was denied. *Id.* Addressing her failure-to-accommodate claim, the district court held that the defendant was not required to "accommodate her disability by placing her on light-duty status" because "[g]iven [her] physical limitations, . . . [she was] incapable of performing the essential functions of a [university] police officer." *Id.* at 90. "Reasonable accommodation does not require an employer to restructure an existing job to remove some of its essential functions." *Id.*; *see also Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 285 n.4 (3d Cir .2001) ("Employers are not required to accommodate an employee by removing an essential function or restructuring a job so as to avoid [implicating the disability], but, rather, they are to provide an accommodation so as to enable the employee to perform such a function."); *Dorchy*, 45 F. Supp. 2d at 13 ("If the position . . . requires performance of certain tasks essential to the job

and [the plaintiff] cannot perform those tasks with a reasonable accommodation, [the defendant] is not required by the ADA to change the essential functions of the job."). Indeed, at least one court has noted that, in the realm of police operations, an argument that a law enforcement agency "should have kept [an officer] on light duty permanently . . . would fail because permanent, light-duty positions would effectively eliminate the essential functions of chasing suspects on foot and making forcible arrests." *Lapier v. Prince George's Cty.*, No. 10-CV-2851, 2013 WL 497971, at *4 (D. Md. Feb. 7, 2013). Moreover, Plaintiff has admitted that her light duty assignments were temporary; indeed, she opined that employees in the Security Clearance Division were hostile to her because "[t]hey had many light duty officers come in and out of their office, and they were accustomed to us leaving them." ECF No. 26-3 at 7. Thus, as in *Jones*,

> nothing indicates that these positions were permanent; to the contrary, the evidence indicates that the defendant permitted light-duty status only when space was available in light-duty areas and only for a finite period of time. Furthermore, the defendant is not obligated to "transform temporary work assignments into permanent positions," and the court will not create a permanent light-duty position where none existed before.

505 F. Supp. at 90 (quoting *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 696 (7th Cir. 1998)). Therefore, any argument that Plaintiff was "entitled to a permanent light-duty position is unavailing." *Id.* at 91.

To be sure, "[a] reasonable accommodation may consist of reassignment to a new job." *Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017). However, the plaintiff has "an obligation to demonstrate that there existed some vacant position to which [s]he could have been reassigned." *Senatore v. Lynch*, 225 F. Supp. 3d 24, 38 (D.D.C. 2016) (alteration in original) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1304 n. 27 (D.C. Cir. 1998)); *see also, e.g., Faison v. Vance–Cooks*, 896 F. Supp. 2d 37, 60 (D.D.C. 2012) ("[I]t is the plaintiff's burden to identify available

positions and to demonstrate that she was qualified for those positions."). That is, insofar as Plaintiff asserts that she should have been reassigned to another job, to survive Defendant's motion for summary judgment she must identify that job, show that it was available, and establish that she could perform its essential functions. *See, e.g.*, *Harris*, 257 F. Supp. 3d at 76. Plaintiff has failed to do so here.

For these reasons, Defendant's motion for summary judgment as to Plaintiff's failure-to-accommodate claim should be granted.

### 2. Disparate Treatment

In addition to her failure-to-accommodate claim, Plaintiff also appears to press a disparate treatment claim under the Rehabilitation Act. ECF No. 26-1 (listing facts allegedly showing "Defendant's disparate treatment of Plaintiff"). As with a failure to accommodate claim, the plaintiff in a disparate treatment claim must establish as a threshold issue that she is an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). Plaintiff has failed to do that, as discussed above. *See* Section III.A.1 & n.9. That alone is sufficient reason to grant Defendant's motion on Plaintiff's disparate treatment claim. *See, e.g.*, *Butler*, 275 F. Supp. 3d at 83 ("[B]ecause obtaining the required medical certification is an essential function for the bus operator position, Butler's sleep-apnea condition rendered him not 'otherwise qualified,' and therefore beyond the protection of the Rehabilitation Act on this basis alone."); *cf. Reagan-Diaz*, 246 F. Supp. 3d at 340–41 (indicating that an inability to perform the essential functions of one's job is always a legitimate reason for termination).

In any case, even if Plaintiff were considered a qualified individual with a disability, her disparate treatment claim would fail. Here, Defendant has asserted that there were legitimate non-discriminatory reasons for the refusal to convert Plaintiff's temporary assignment into a permanent

24

job, among them documented incidents of an inability to deal appropriately with supervisors or with "the dynamics of an office environment," performance problems that resulted in reassignments, "fail[ure] to maintain connectivity on her Blackberry device despite counseling," and a lack of candor in responding to Inspector Wilkerson's questions about her BlackBerry during the meeting in early August 2011. ECF No. 22 at 10; ECF No. 26-25 at 2.

It is undisputed that there is significant evidence supporting Defendant's proffered explanations. Deputy Chief Sullivan and Sgt. Cook both testified during their depositions about Plaintiff's performance issues. ECF No. 26-6 at 16–17. Deputy Chief Sullivan reported that, although Plaintiff started out well in the Safety and Health Unit, as time progressed, her supervisors noted that she was "not doing what she[] [was] supposed to do." ECF No. 26-6 at 16. Sgt. Cook noted that she "couldn't handle [] day-to-day operations" and "brought a lot of personal issues to work," and also reported that Special Agents Armiger and Hourican had complained about her lack of productivity and failure to exhibit teamwork. ECF No. 26-4 at 6, 10, 15. When Plaintiff was moved to the Security Clearance Division, she lasted for a single day and was reassigned due to poor performance. ECF No. 26-3 at 7; ECF No. 26-25 at 2. Plaintiff admitted that she "didn't really know what [she] was supposed to do" at that post. ECF No. 26-3 at 7.

Plaintiff's repeated problems with BlackBerry connectivity are well-documented. Plaintiff does not contest that the record includes evidence of five different occasions in which her Black-Berry was out of contact for periods of days. ECF No. 22-3 at 102–06. The evidence shows that Plaintiff displayed a lack of candor regarding the incident in which she misplaced that device. Asked by Inspector Wilkerson whether the device was functioning correctly, she responded that the "BlackBerry was functioning properly" but failed to report it missing, in violation of Secret Service policy. ECF No. 26-3 at 10; ECF No. 26-4 at 17. Hours later, she admitted to Sgt. Cook

that she had not seen the BlackBerry since July 30, 2011. ECF No. 26-15 at 2. But her explanation for this behavior at her deposition—"Well, the last time I saw it [before Inspector Wilkerson asked about it], it was functioning properly" (ECF No. 26-3 at 10)—is an admission that she did not know at the time the question was asked whether the device was functioning; rather, she knew it had been functioning three days earlier. In any case, even if her response could be construed as technically accurate because Inspector Wilkerson failed to ask explicitly whether Plaintiff was in possession of the device, it was clearly incomplete. Further, although ordered to complete a police report about the loss of the device, she failed to do so until she was "tracked down" and "walked through the process." ECF No. 26-15 at 2.

Finally, the record reflects that Plaintiff had issues dealing with supervisors and routine work situations. She admitted that she was upset about the meeting with Special Agents Armiger and Hourican in which they asked her to work in the filing room with the student intern and keep track of the filing because she thought she was "being punished for something that someone else had failed to do." ECF No. 26-3 at 6. After her single day working in the Security Clearance Division, she described it to Sgt. Cook as "a really horrible experience." *Id.* at 7. Sgt. Cook noted that she became "extremely emotional" if she was challenged or constructively criticized. ECF No. 26-4 at 6. Deputy Chief Sullivan also noted "a couple of times" when Plaintiff "lost her composure" at work. ECF No. 26-6 at 16–17.

Plaintiff attempts to undermine these non-discriminatory reasons by pointing to her prior acceptable reviews and to testimony that Plaintiff's admittedly emotional response to the news that she would not be converted to a career position was "appropriate," as well as by identifying alleged comparators who were treated more favorably than she was. ECF No. 25 at 7–8, 17–19, 22, 27, 29–30. A plaintiff "can satisfy his burden to prove discriminatory animus . . . by offering evidence

that the defendant did not honestly believe the reason it offered" for the adverse employment action. *Miller v. Hersman*, 759 F. Supp. 2d 1, 17 (D.D.C. 2010). But a court may not "'second guess an employer's personnel decision absent demonstrably discriminatory motive.' As a result, '[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.'" *Smith v. Jackson*, 539 F. Supp. 2d 116, 136 (D.D.C. 2008) (alterations in original) (internal citations and quotation marks omitted) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Plaintiff's attempts to show that Defendant did not believe its proffered performance-related reasons plainly fail. Defendant points out that the final official performance evaluation in the record, which was approved on July 14, 2011, evaluated her performance through June 30, 2011. ECF No. 26-35. The undisputed record shows, however, that Plaintiff's performance problems began to be noticed in the lead-up to her meeting with Agents Armiger and Houlican, approximately three weeks later. ECF No. 26-3 at 6; ECF No. 26-4 at 6, 10, 15; ECF No. 26-6 at 16; ECF No. 26-8 at 5. At that point, she was reassigned to the Security Clearance Division, and transferred out after one day because of productivity issues. ECF No. 26-3 at 7; ECF No. 26-25 at 2.

Moreover, these performance problems occurred in jobs outside of the division for which Plaintiff was hired. The regulations governing her probationary employment state that "[t]he agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his services during this period if he fails to demonstrate fully his qualifications for continued employment." 5 C.F.R. § 315.803(a). Under that regulation, an employee can be terminated for performance issues that do not rise to the level of "good cause for

terminating a permanent employee." *Holbrook v. Reno*, 196 F.3d 255, 262 (D.C. Cir. 1999) (quoting *McKenna v. Weinberger*, 729 F.2d 783, 789–90 (D.C. Cir. 1984)). Here, the evidence shows not only that Plaintiff failed to demonstrate her fitness for the job for which she was hired, but she performed light-duty assignments in a manner that inspired worries about her productivity and temperament and required more than one reassignment. Plaintiff does not, for example, deny that her one-day tenure in the Security Clearance Division was unsuccessful or that she reacted emotionally after the meeting in July 2011 in which she was directed to keep track of her filing. Nor does Plaintiff deny that her BlackBerry was repeatedly out of contact. And, as noted above, her response to the charge that she lacked candor in the early August meeting in which she was asked about the device does not go far to undermine Defendant's explanation that Plaintiff was not converted to career status because she "lacked honesty during her meeting with Inspector Wilkerson." ECF No. 26-25 at 2.

Finally, Plaintiff would be hard-pressed to establish to a reasonable factfinder that Defendant's failure to convert her to career status was based "solely" on her disability, 29 U.S.C. § 794(a), when at the time the decision was made she was unable to perform the essential functions of a Uniformed Division Officer in the Secret Service. *Cf. Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015) (affirming the grant of summary judgment to the defendant on retaliation claim where, even in light of "inconsistency in the proffered rationales" for the plaintiff's termination, at the relevant time the plaintiff was "unable to perform the functions of her position even with an accommodation").

Plaintiff's comparator evidence fares no better. For a plaintiff to establish with comparator evidence that there is a genuine issue of fact for trial as to pretext, she must identify one or more individuals who are similarly situated to the plaintiff but are outside of her protected class and who

have been treated more favorably by the employer. *Brady*, 520 F.3d at 495. It is the plaintiff's burden to show that "all of the relevant aspects of her employment situation were nearly identical" to that of the comparators. *Baker v. Potter*, 294 F. Supp. 2d 33, 40 (D.D.C. 2003) (quoting *Marks v. Westphal*, No. 01-5300, 2002 WL 335510, at *1 (D.C. Cir. Jan. 25, 2002) (per curiam)). For a plaintiff's employment situation to be "nearly identical" to a comparator's, "the alleged comparator 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Toomer*, 2016 WL 9344023, at *28 (quoting *Phillips*, 937 F. Supp. at 37).

Here, Plaintiff points to five individuals whom she claims are similarly situated to her. An initial problem is that it is not clear from the submissions whether they are each outside of the protected class at issue—that is, qualified individuals with a disability, *see, e.g.*, *Webster*, 267 F. Supp. 3d at 260 (identifying the class protected by the Rehabilitation Act as "qualified individual[s] with a disability"). One of them—identified herein as "D.S."—is identified as a male with a disability who was "referr[ed] to personnel and employee assistance" after he informed his supervisors that he would not be able to return to full-duty status (ECF No. 25 at 29; ECF No. 26-5 at 17; ECF No. 26-7 at 13), which makes him irrelevant as a comparator for Plaintiff's claim of disparate treatment under the Rehabilitation Act (but not for her gender discrimination claim, which is discussed below). Three others are identified as "male Uniformed Division Officers LE1" who were not converted to career status (ECF No. 26-8 at 5) with no indication as to whether any or all had a disability within the meaning of the Rehabilitation Act. Similarly, a fifth is identified merely as "a [Uniformed Division] Officer in his probationary period" who was suspended for one

29

day after he misplaced his weapon for 45 minutes (*id.* at 9–10), again with no information as to his disability status.

Assuming that the latter four are not disabled and are therefore outside of Plaintiff's protected class for the purposes of her claims of disparate impact based on disability, Plaintiff does not provide enough information to determine if they are, indeed, similarly situated to her. There is no information about whether any of those individuals dealt with the same supervisors as did Plaintiff, for example. Rather, there is evidence that the three individuals who were not converted to career status worked in either the White House Branch or the Foreign Missions Branch of the Uniformed Division in 2007, years earlier than the point at which Plaintiff was not converted in 2011. ECF No. 22-2 at 42–44. A memorandum outlining the discipline for the above-identified probationary officer who had misplaced his weapon indicates that he was in the Special Operations Division in 2012. ECF No. 26-14 at 2. Plaintiff, who performed light duty in the Safety and Health Division, the Security Clearance Division, and the Central Files Office, makes no attempt to show that these comparators were supervised or evaluated by those who evaluated her—Inspector Wilkerson, Deputy Chief Sullivan, Capt. Wojnatowski, Sgt. Cook, and, ultimately, Assistant Director for the Office of Protective Operations Mickey Nelson, who made the ultimate decision not to convert Plaintiff to career status. ECF No. 26-8 at 4.

There are additional problems other than the fact that Plaintiff has not shown that the circumstances of the comparators' employment were similar to hers. She argues that the probationary officer who lost his weapon was treated more favorably than she was because he was merely suspended without pay for one day. ECF No. 25 at 30; ECF No. 26-14 at 2. However, identifying one officer who "lost or misplaced . . . government issued items" (ECF No. 25 at 30) and was not thereafter terminated "is simply not enough—without more context—for a reasonable factfinder

to determine that the officer's misconduct was 'categorically similar' to Plaintiff's misconduct." *Evans v. District of Columbia*, 219 F. Supp. 3d 99, 110 (D.D.C. 2016). Here, for example, Plaintiff did not merely misplace her government-issued BlackBerry; rather, she admits that she failed to tell supervisors during a meeting to address her issues with the device that it was missing. Moreover, as discussed, Plaintiff had other documented performance issues. Because "[t]he record does not indicate . . . whether [the comparator's temporary loss of his weapon] was coupled with other types of misconduct," as was Plaintiff's temporary loss of her BlackBerry, it "do[es] not allow for the kind of meaningful comparison that would enable a factfinder to conclude that Plaintiff and the unnamed officer . . . were similarly situated." *Evans*, 219 F. Supp. 3d at 110.

Finally, the fact that three "male Uniformed Division Officers LE1" were not converted to career status does not help Plaintiff to establish that Defendant's non-discriminatory reasons for allowing her appointment to terminate were pretextual. To do so, she should produce a similarly-situated individual who was treated *more favorably* than she was. *See, e.g.*, *Nurruddin v. Bolden*, 818 F.3d 751, 761 (D.C. Cir. 2016) ("The best evidence demonstrating unequal treatment would be a comparison. Here, that would be another employee assigned to detail that [the defendant] treated more favorably than [the plaintiff]."). Here, however, she has produced evidence that three individuals whose conduct, like Plaintiff's, inspired multiple concerns[12] were treated comparably to her: none of them was converted to career status. ECF No. 25 at 30; ECF No. 26-8 at 5. This is not sufficient to show pretext. *See, e.g.*, *Stockett v. Muncie Indiana Transit Syst.*, 221 F.3d 997, 1002 (7th Cir. 2000) (finding evidence that "[r]ather than treating the two employees differently,

---

[12] One of those individuals missed a court hearing, failed to qualify with his weapon, and failed to provide documentation regarding his use of sick leave; another was late for duty once, failed to return arrest paperwork to his supervisor, and failed to improve his communication skills with supervisors; the last had difficulty working in a highly structured environment and following the chain of command. ECF No. 26-8 at 5.

the . . . supervisors treated them identically" did not establish a disparity in treatment based on membership in a protected class); *Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1322–23 (M.D. Ala. 1998) (holding that the plaintiff had not established disparate treatment because a similarly-situated person outside her protected class was treated the same as she was); *cf. Jones v. Potter*, 488 F.3d 397, 407 (6th Cir. 2007) ("[T]he fact that some [similarly-situated employees] were also treated identically (by also receiving notices of removal) indicates that the plaintiff's conduct was 'sufficient' to motivate his firing."); *Ramsy v. Marriott Int'l, Inc.*, __ F. Supp. 3d __, __, 2018 WL 4682231, at *5 (S.D.N.Y. 2018) ("In cases in which multiple employees are terminated for the same infraction, courts generally find that the plaintiff has failed to meet the fourth element—that circumstances give rise to an inference of discriminatory intent."), *appeal docketed*, No. 18-3260 (2d Cir. Oct. 30, 2018).

While "determining whether . . . employees are similarly situated is ordinarily a question of fact for the jury," *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016), here, Plaintiff has utterly failed to show that any comparators were subject to the same supervisors that they engaged in similar conduct as did she. *See, e.g.*, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) ("'In the absence of evidence that the comparators were actually similarly situated' to [the plaintiff], an inference of . . . discrimination is not reasonable." (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 995–96 (D.C. Cir. 2002))); *Huckstep v. Washington Area Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 81–82 (D.D.C. 2016) ("[I]f a reasonable jury could not find that the putative comparator and the plaintiff are similarly situated, the court can decide, as a matter of law, that the two are not similarly situated.").

In short, Plaintiff's evidence would not allow a reasonable jury to conclude that Defendant's concerns about Plaintiff's performance and conduct issues were fabricated and merely pretexts for disparate treatment based on her disability. Therefore, Defendant's motion for summary judgment should be granted as to Plaintiff's claim for disparate treatment based on her disability.

### B. Title VII

Plaintiff's attempt to stave off summary judgment on her Title VII gender discrimination claim is also unsuccessful. Although she clears the threshold hurdles—she is a member of a protected class and suffered an adverse employment action when she was not converted to career status—no reasonable jury could find based in the record before the Court that Defendant's non-discriminatory reasons for the non-conversion were pretextual.[13]

As for those reasons, Defendant points to the issues outlined in Capt. Wojtanowski's memorandum of August 26, 2011, that is, Plaintiff's issues with BlackBerry connectivity, her lack of candor during the early August meeting about that device, her performance problems, and her "inappropriate emotional responses." ECF No. 26-25 at 2. The question is whether Plaintiff has pointed to evidence that would be sufficient for a reasonable factfinder to decide that Defendant's "asserted non-discriminatory reason[s] [were] not the actual reason[s] and that the employer intentionally discriminated against the employee" on the basis of sex. *Brady*, 520 F.3d at 494.

---

[13] Under Title VII, a plaintiff can claim that the adverse employment action at issue—here, the failure to convert Plaintiff to career status—"was perpetrated 'because of' her race, color, religion, sex, or national origin" or "that any of those qualities 'was a motivating factor for [the] employment practice, even though other factors also motivated the practice." *Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 424 (D.D.C. 2015) (alteration in original) (quoting 42 U.S.C. § 2000e-2(a) & (m)). "The first is known as a 'single-motive' or 'pretext' theory of discrimination, and the second is known as a 'mixed-motive' theory. *Id.* "A plaintiff who is successful in a mixed-motive case can . . . obtain [only] injunctive relief, declaratory relief, and attorney's fees and costs. *Id.* at 424 n.11 (citing 42 U.S.C. 2000e-5(g)(2)(B)(i)). Here, Plaintiff has not made a mixed-motive argument; rather, she argues that Defendant failed to convert her because of her sex and that Defendant's reasons are pretextual (ECF No. 25 at 27–30) and she seeks an award of damages rather than injunctive or declaratory relief (ECF No. 1 at 6). There is no need, therefore, to address a mixed motive theory here.

Plaintiff relies primarily on comparator evidence. Again, it is unconvincing. Although each of the identified comparators is male and therefore outside of Plaintiff's protected class for the purposes of her gender discrimination claim, Plaintiff has again failed to provide sufficient information to allow a reasonable factfinder to determine that the comparators were similarly situated to her. As noted above, for the individual who misplaced his gun, there is no indication that he worked with the same supervisors as Plaintiff and no suggestion that his misconduct was coupled with other issues. Also as noted above, Plaintiff has failed to show that the three individuals who were not converted to career status reported to the same supervisors as she did or that they were treated more favorably than she was.

That leaves D.S., who, according to Plaintiff, "was a male Uniformed Division Officer suffering from a disability and placed on light-duty similar to Plaintiff." ECF No. 25 at 29. He later advised Inspector Wilkerson and Capt. Wojnatowski that he would be unable to perform the duties of a Uniformed Division Officer due to that disability. ECF No 26-5 at 17; ECF No. 26-7 at 14. When he informed the officers that he wished to stay with the Secret Service, they referred him to the personnel department "to see if a civilian opportunity existed." ECF No. 26-5 at 17; ECF No. 26-7 at 14. D.S. then sought certification as a person with "severe physical disabilities" and was able to secure a position pursuant to special hiring authority allowing appointment of such individuals under so-called "Schedule A." ECF No. 22 at 8; 5 C.F.R. §§ 213.3101, 213.3102(u).

Plaintiff's evidence as to D.S.'s similarity to her is similarly deficient as her evidence as to the other identified comparators. Although it appears that D.S. worked with some of the same supervisors as Plaintiff, neither Inspector Wilkerson nor Capt. Wojnatowski was responsible for the allegedly favorable treatment that he received. Rather, they merely referred him to the personnel department, as neither was responsible for civilian hiring. ECF No. 26-5 at 17; ECF No. 26-7

at 14. Plaintiff has also failed to show that D.S. exhibited similar performance and conduct issues as did she. *See Evans*, 219 F. Supp. 3d at 110 (to show that an individual is similarly situated, a plaintiff must show that he engaged in similar relevant conduct). Finally, the evidence suggests that there are "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Toomer*, 2016 WL 9344023, at *28 (quoting *Phillips*, 937 F. Supp. at 37). Specifically, when he was informed that he would not be able to perform the duties of a Uniformed Division Officer, D.S. sought and received certification as a person with a severe physical disability in order to be eligible for a Schedule A position. Plaintiff has admitted that she did not do so. ECF No. 22-2 at 48. That is, D.S's favorable treatment—continued employment with the Secret Service in a civilian capacity—was a result of a process that Plaintiff did not attempt. Plaintiff has not, therefore, marshalled sufficient evidence to allow a reasonable factfinder to determine that D.S. was similarly situated to her.

In a single sentence at the beginning of her opposition to Defendant's motion for summary judgment, Plaintiff states that Defendant's asserted reasons for terminating Plaintiff are "clearly rooted in sex-based stereotypes" and specifically mentions Plaintiff's "emotional responses." ECF No. 25 at 2. That is the sole mention of sex stereotyping in the brief and it is unsupported by any argument or legal citation. This argument, too, should be deemed forfeit because it is utterly undeveloped. *See, e.g., TDC Mgmt. Corp.*, 827 F.3d at 1130 (holding argument "forfeit because [the party] does not further develop it (or even mention it again) after [a] 'single, conclusory statement'" (quoting *Bryant*, 532 F.3d at 898)); *Johnson*, 953 F. Supp. 2d at 250 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

Even if the argument is not forfeit, it is unsuccessful. It is ultimately unnecessary to determine whether in these circumstances a reasonable jury could find that the decision not to convert Plaintiff to career status was actually illegally based on sex stereotyping, because other facts sufficiently undermine the claim here. For example, both Sgt. Cook, who reported instances of Plaintiff's emotional responses (ECF No. 26-4 at 8–9), and Capt. Wojnatowski, who authored the memo documenting those responses (ECF No. 26-25), are also members of Plaintiff's protected class. Where supervisors involved in a plaintiff's negative assessment are members of that plaintiff's protected class, "any inference of discrimination, without additional evidence, is not warranted." *Eder v. City of New York*, No. 06 Civ. 13013, 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009); *see also Horvath v. Thompson*, 329 F. Supp. 2d 1, 5 (D.D.C. 2004) (noting that the plaintiff's burden of establishing pretext "is even tougher" when the involved official is of the same protected class as the plaintiff); *Nichols v. Caroline Cty. Bd. of Educ.*, No. Civ. JFM-02-3523, 2004 WL 350337, at *7 (D. Md. Feb. 23, 2004) (where evaluators are members of the same protected class as the plaintiff, "any inference of discrimination" is "weaken[ed]"), *aff'd*, 114 F. App'x 576 (4th Cir. 2004); *Walker v. Dalton*, 94 F. Supp. 2d 8, 16 (D.D.C. 2000) (finding no inference of pretext where one of the three members of the panel evaluating the applicant was in the applicant's protected class).

More fundamentally, where, as here, an employer raises several legitimate non-discriminatory reasons for an adverse employment action, a plaintiff must show that each of them is merely a pretext for a discrimination. *See, e.g.*, *Davis v. George Washington Univ.*, 26 F. Supp. 3d 103, 119 (D.D.C. 2014); *Hairston v. Boardman*, 915 F. Supp. 2d 155, 161 (D.D.C. 2013) ("To defeat a Title VII defendant's summary judgment motion, a plaintiff must demonstrate pretext as to all of the defendant's proffered neutral explanations, not just some of them."). That is, Plaintiff must

provide evidence to allow a reasonable fact-finder to determine that *none* of Defendant's proffered reasons for not converting her to career status—including her performance problems, Blackberry connectivity issues, and lack of candor regarding her loss of the device—is the real reason, but that each is merely a pretext to hide the fact that she was not converted because of her sex. However, Plaintiff does not attempt to connect any of those other reasons to sex stereotyping and has otherwise failed to undermine them.

For these reasons, the undersigned recommends granting Defendant's motion for summary judgment as to Plaintiff's gender discrimination claims under Title VII.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment (ECF No. 22) be **GRANTED**.

*    *    *    *    *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  January 9, 2019

Digitally signed by G.
Michael Harvey
Date: 2019.01.09
12:38:12 -05'00'

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE